*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1105**

Marcia H. Thurmer,
Relator,

vs.

Attorney Edward R. Shaw, P.A.,
Respondent,

Department of Employment and
Economic Development,
Respondent.

**Filed March 7, 2016
Reversed
Jesson, Judge**

Department of Employment and
Economic Development
File No. 33345863-3

Shawn B. Reed, Maki & Overom, LTD., Duluth, Minnesota (for relator)

Edward R. Shaw, Edward R. Shaw, P.A., Brainerd, Minnesota (attorney pro se respondent)

Lee B. Nelson, Timothy C. Schepers, Anne Bloomberg Froelich, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

        Considered and decided by Peterson, Presiding Judge; Kirk, Judge; and Jesson, Judge.

UNPUBLISHED OPINION

**JESSON**, Judge

Relator challenges the determination of an unemployment-law judge (ULJ) denying her claim for unemployment benefits, arguing that she did not commit employment misconduct. Because the ULJ's determination of employment misconduct was not supported by substantial evidence, we reverse.

## FACTS

Relator Marcia Thurmer was employed full-time as a paralegal with Edward R. Shaw, P.A., from 2005 to January 29, 2015. Edward Shaw testified that Thurmer was a good employee until her final year of employment. Shaw testified that, in that final year, the biggest issue was Thurmer's inability to control her anger, which led to outbursts at coworkers and tension in the office. Firm employees testified that, when they attempted to discuss routine issues with Thurmer, she would become hostile and throw "tantrum[s]" in the office. Those witnesses also testified that at times Thurmer yelled and screamed on the phone.

The witnesses pointed to two specific examples of inappropriate outbursts. According to the firm's office manager, the first incident occurred approximately four to ten months prior to Thurmer's discharge. Thurmer called the office manager a "f--king a--hole" after the office manager transferred a phone call to Thurmer. Thurmer was upset that the office manager did not identify the caller before the transfer.

The second incident occurred during her last month of employment. Thurmer was having a difficult time dealing with a client and, according to another employee in the

meeting, "got up … stormed out of the office, slammed the door, [and] went outside." The client's wife then asked the other employee in the meeting why Thurmer acted "so rude and condescending."

Thurmer also had performance issues in her final year at the firm. She missed appointments and deadlines. She misplaced client documents and was resistant to working with new technology that the firm was attempting to implement. She also was reluctant to work on cases other than the bankruptcy cases that she had traditionally handled.

Shaw testified that he spoke with Thurmer on several occasions about her outbursts in her final year of employment. On January 9, 2015, Shaw sent Thurmer an email warning her that her behavior could lead to dismissal:

> I understand that you are under a lot of stress. But, the way that you have acted at times is not appropriate and cannot continue. You cannot yell at others in the office, storm into my offices or others when you are upset, not attend or leave scheduled meetings, or refuse to go along with office decisions.
>
> ….
>
> I do not want you to leave, but if you yell at or insult anyone here, refuse to follow office decisions or policies, or do not follow my decisions about changes in bankruptcy or other procedures you will be terminated for misconduct.

Shaw testified that after this warning Thurmer continued to act in a rude and unprofessional manner, but he could not point to any specifics. He claimed that "right at the very end, the last few days [Thurmer's] behavior was tamped down around me but it continued outside of my presence." Thurmer's employment was terminated on January 29, 2015. Shaw

3

testified that his decision to discharge Thurmer was primarily due to Thurmer's continued rude and unprofessional behavior.

The Minnesota Department of Employment and Economic Development (DEED) initially determined that Thurmer was not discharged for employment misconduct. Accordingly, DEED determined that Thurmer was eligible for unemployment benefits. Shaw appealed DEED's determination, and a hearing was held before a ULJ. At the hearing, Shaw, the office manager, and two other firm employees testified on behalf of the firm. Thurmer testified on her own behalf, along with two of the firm's former clients. Thurmer denied calling the office manager a "f--king a--hole" but acknowledged that she had called the office manager a made up word, when the office manager transferred a call to her without communicating the caller's name. Thurmer admitted walking out of a meeting with a client, although she testified that she only left the meeting for a short time to compose herself and that, when she returned, she worked with the client without incident.

Thurmer also elicited testimony from one of the employer's witnesses that he had written her a letter of recommendation after her termination. The letter, which was read into the record, said that the employee "would recommend [Thurmer] for most offices," that Thurmer "is passionate and works hard on client matters," and that Thurmer "should be an asset for legal work in a variety of office settings."

In her closing statement and a prior written statement submitted to DEED, Thurmer said that she believes she was terminated because she filed a workers' compensation claim. Shaw testified that Thurmer's discharge had nothing to do with the workers' compensation

4

claim and that he was not aware of the workers' compensation claim until early to mid-January of 2015.

The ULJ issued a decision concluding that "Thurmer was discharged for employment misconduct" and therefore "ineligible for unemployment benefits." The ULJ found that "Thurmer had acted in a rude and unprofessional manner towards her co-workers," and "in at least one case . . . was rude towards clients." The ULJ also found that her conduct was either intentional or indifferent and "display[ed] clearly a serious violation of the firm's reasonable expectations." With regard to the letter of recommendation, the ULJ found that "[w]hile the letter was favorable, the language was tempered" and was "not inconsistent with [the author's] testimony given during the hearing." The ULJ later denied Thurmer's request for reconsideration and affirmed the original order as modified. This certiorari appeal follows.

**DECISION**

An employee who is discharged by her employer for employment misconduct is not eligible for unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2014). Employment misconduct is defined as "conduct . . . that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." *Id.*, subd. 6(a) (2014).

When reviewing an unemployment-insurance-benefits decision, we may affirm, remand the case for further proceedings, or reverse and modify the decision if the substantial rights of the relator have been prejudiced because the conclusion, decision,

5

findings, or inferences are affected by errors of law, unsupported by substantial evidence in view of the entire record, or are arbitrary or capricious. Minn. Stat. § 268.105, subd. 7(d) (Supp. 2015). We review the ULJ's factual findings in the light most favorable to the decision and defer to the ULJ's credibility determinations. *Peterson v. Nw. Airlines Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008), *review denied* (Minn. Oct. 1, 2008). Whether an employee engaged in conduct that disqualifies the employee from unemployment benefits is a mixed question of fact and law. *Id.* But we review de novo the legal question of whether the particular act committed by the employee constitutes employment misconduct. *Id.* In so doing, we keep in mind that chapter 268 is "remedial in nature and must be applied in favor of awarding . . . benefits," and any provision precluding benefits must be narrowly construed. Minn. Stat. § 268.031, subd. 2 (2014).

Thurmer first argues that her performance issues cannot form the basis of an employment-misconduct determination. Thurmer correctly points out that an employee is not discharged for employment misconduct within the definition of Minn. Stat. § 268.095, subd. 6(a), if termination is the result of "conduct that was a consequence of the applicant's inefficiency or inadvertence," "simple unsatisfactory conduct," or "good faith errors in judgment if judgment was required." Minn. Stat. § 268.095, subd. 6(b)(2)-(3), (6) (2014). We agree that the testimony of Shaw and his witnesses that Thurmer misplaced documents, occasionally missed meetings and deadlines, was reluctant to work with new technology, and generally mismanaged her time does not amount to employment misconduct. This conduct was the result of inefficiency, inadvertence, and simple unsatisfactory conduct and does not rise to the level of "a serious violation of the standards of behavior the employer

6

has the right to reasonably expect of the employee" or show "a substantial lack of concern for the employment." Minn. Stat. § 268.095, subd. 6 (2014). We further note that these performance issues played only a small part in Shaw's decision to terminate Thurmer's employment and were not a major consideration in the ULJ's determination of employment misconduct.

Thurmer next argues that the ULJ's decision that she was dismissed for misconduct based on her unprofessional behaviors is not supported by substantial evidence. We agree. While Shaw and his witnesses testified in general about yelling, rude behavior, and hostile tones, they cited only two specific instances where Thurmer acted in a rude and unprofessional manner.

While Thurmer disputes the employer's characterization of the two incidents, the question of whether an employee committed a particular act is a question of fact, and we defer to the ULJ's credibility determinations. *See Peterson*, 753 N.W.2d at 774. In this case, the record contains sufficient evidence to sustain the factual findings that, indeed, "[i]n one case, Thurmer was upset with [the office manager] and called her a 'f[--]king a[--]hole'" and that "[i]n at least one case, she exhibited a rude tone towards clients in a meeting leading to the clients questioning the firm's ability to handle their case properly." But our inquiry does not end there. We must ascertain whether these two incidents, in addition to very general testimony about unprofessional behavior, substantially support the ULJ's determination that Thurmer was discharged for employment misconduct. *See* Minn. Stat. § 268.105, subd. 7(d).

We find the record lacking.

7

The first incident, when Thurmer called the office manager a "f--king a--hole," occurred many months before Thurmer's termination.[1]  While this conduct was clearly inappropriate, the lapse of time between an incident and the discharge may negate the causal relation between the misconduct and the discharge where there is no reason given for the delay.  *See Redalen v. Farm Bureau Life Ins. Co.*, 504 N.W.2d 237, 239 (Minn. App. 1993) (stating this rule).  We acknowledge that the reason for discharge is a fact question for the ULJ, but there are no facts in the record explaining the long delay between this incident and the termination of Thurmer's employment.

The second incident occurred in the final month of Thurmer's employment.  The office manager testified that Thurmer got frustrated during a meeting with clients and "got up . . . stormed out of the office, slammed the door, [and] went outside."  Thurmer testified that she was just taking a break.  She further testified that, when she returned, she and the clients continued to work on the file and made good progress.  Although we defer to the credibility determinations of the ULJ regarding what occurred during the initial meeting, Thurmer's testimony that she and the clients worked well together when she returned to the meeting was uncontested.  We recognize that Thurmer did not handle this situation in a professional manner, but, standing alone, Thurmer's decision to temporarily leave the

---

[1] The ULJ did not make a specific finding as to when this incident occurred.  His findings, however, indicate that he believed this incident occurred sometime within the final year of Thurmer's employment.  The office manager testified that this incident occurred six months to a year prior to the March 23, 2015 hearing before the ULJ.  Thurmer claimed in a written document submitted to DEED that it occurred in "early 2014."  In any event, it is clear that the incident occurred several months prior to Thurmer's January 29, 2015 discharge.

meeting does not rise to the level of employment misconduct. *See* Minn. Stat. § 268.095, subd. 6(d) ("If the conduct for which the applicant was discharged involved only a single incident, that is an important fact that must be considered in deciding whether the conduct rises to the level of employment misconduct . . . .").

We also note that Shaw issued Thurmer a written warning on January 9, 2015. Though it is not entirely clear from the record, it appears that this warning was issued shortly after the above client meeting incident. At least as of January 9, 2015, Shaw determined that Thurmer's conduct merited a stern written warning, but not employment termination. DEED takes another approach to the written warning. It argues that Thurmer's failure to comply with this warning shows that she committed employment misconduct by "refusing to abide by [her] employer's reasonable policies and requests." *See Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002) (stating this standard). But Shaw and his witnesses were unable to point to any specific incident after this warning was issued that precipitated Thurmer's discharge. Shaw simply provided general testimony that Thurmer did not follow the warning and that the angry outbursts continued. He also stated that in the final days of Thurmer's employment, "her behavior was tamped down around [him] but it continued outside of [his] presence." But Shaw's employees were not able to point to a specific incident of inappropriate behavior in the final days of Thurmer's employment.

Thurmer was employed by Edward R. Shaw P.A. for approximately ten years. Shaw testified that Thurmer's discharge was primarily the result of her inappropriate behavior in the final year of her employment, yet he and his witnesses were only able to point to two

specific instances of this misbehavior. The first incident occurred several months prior to Thurmer's termination, and the second does not rise to the level of employment misconduct. The vast majority of the testimony supporting the ULJ's determination that Thurmer was fired for "rude" and "unprofessional" behavior consists of vague and general statements without any specifics. We also note that, after she was discharged, one of Shaw's witnesses wrote Thurmer a favorable letter of recommendation for future employment. Given Thurmer's longtime employment with the firm, the lack of specific evidence in the record, and the remedial nature of chapter 268, we conclude that the ULJ's determination that Thurmer was fired for misconduct is not supported by substantial evidence. We recognize that Shaw may have made a wise business decision by discharging Thurmer, but the record does not support a finding that Thurmer committed "a serious violation of the standards of behavior the employer ha[d] the right to reasonably expect" or showed a "substantial lack of concern for the employment." Minn. Stat. § 268.095, subd. 6(a).

**Reversed.**